IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


Roberta J. Pysher,                    :

        Plaintiff,                    :

    v.                                :    Case No. 2:02-cv-0219

Ohio Department of Jobs and           :
Family Services, et al.,                   MAGISTRATE JUDGE KEMP
                                      :
        Defendants.

                    OPINION AND ORDER

        This case was filed by Roberta Pysher, an employee of the
Ohio Department of Job and Family Services.  Ms. Pysher alleged
in her complaint that, after she returned to ODJFS in 1999
pursuant to a decision of the State Personnel Board of Review,
she was discriminated against and retaliated against by her
employer.  After the Court dismissed some of her claims by way of
summary judgment, this case was tried before the undersigned,
sitting without a jury and with the consent of the parties, from
July 21, 2008 to July 31, 2008.  This opinion and order
represents the Court's findings of fact, discussion, conclusions
of law, and decision with respect to the issues that were tried.


                I.  Findings of Fact


            A.  Ms. Pysher's return to work and
                the situation in the Zanesville office


        In 1996, Ms. Pysher, who had worked for what was then the
Ohio Bureau of Employment Services (OBES), was removed from her
job.  She appealed that removal to the State Personnel Board of
Review, and also became involved in federal court litigation.

The SPBR ultimately found in her favor and ordered her reinstated. She went back to work in 1999.

Ms. Pysher had been a supervisor in an office located in Franklin County. When she came back, at least according to the defendants, there were no open supervisor positions in Franklin County. Ms. Pysher was assigned to an office in Zanesville because a supervisory position in that office was vacant. Zanesville was a small office with fewer than twenty employees. The office management consisted of a manager (Sam McNair) and two supervisors (Patrick Hoffer and, once she was reinstated, Ms. Pysher).

At that time, the supervisory function was divided primarily along service lines. The agency was responsible both for assisting its clients in obtaining employment (the "employment services" or "ES" function) and in obtaining unemployment benefits (the "unemployment claims" or "UC" function). Ms. Pysher's background was in ES, so she became the ES supervisor. Mr. Hoffer was assigned the UC duties.

From almost the beginning, things did not go well for Ms. Pysher. According to Mr. McNair, early on in her tenure in Zanesville, Ms. Pysher mad a comment in the hearing of the office staff which could have been interpreted by staff as a slight to bargaining unit employees. Conflict also developed between Ms. Pysher and Mr. Hoffer, primarily over the scope of their supervisory duties. At times, Mr. Hoffer performed tasks that Ms. Pysher felt were part to the ES function, such as taking job orders from employers and notifying staff about job fairs or job interviews. In October, 1999, Mr. McNair had attempted to define the duties of Ms. Pysher and Mr. Hoffer in a written document (Ex. P83B). According to Ms. Pysher, despite this division, staff would often seek guidance on ES matters from Mr. Hoffer, leaving her with less responsibility. She complained about this

2

situation to Mr. McNair on numerous occasions, (for example, in
Ex. P83U and P83II) but he did nothing definitive to resolve the
situation.  Ms. Pysher also testified that Mr. Hoffer was
constantly undermining her supervisory authority by holding her
up to ridicule and encouraging staff to file unfounded grievances
against her.

By February of 2000, things had gotten to the breaking point
between Ms. Pysher and Mr. Hoffer.  Even according to Mr.
Hoffer's testimony, he raised his voice to Ms. Pysher, telling
her that he would not permit her to "ruin the office."  By April,
2000, she formally requested to be transferred to another office
because she felt she was being harassed by Mr. Hoffer.  By August
of 2000, Ms. Pysher told Mr. McNair that she wanted to complain
formally about discrimination on various grounds.  He passed this
information on to Larry Hampton, who worked in Columbus, and
asked for a contact person within the agency's EEO office to whom
Ms. Pysher could direct her complaint (Joint Ex. 3).  On
September 6, 2000, he gave Ms. Pysher Gerrit Reitveld's name
along with his contact information.  (Joint Ex. 4).

At roughly the same time, Ms. Pysher wrote directly to Mr.
Hampton advising him that the staff wanted to have a meeting to
air their concerns.  She suggested that before this occur, the
office do some "team building."  (Joint Ex. 2).  No specific team
building meetings were held, however.

In order to address the Zanesville office issues in some
way, a meeting was scheduled for October 20, 2000.  Mr. McNair
testified that he was instructed to schedule this meeting by his
supervisors in Columbus.  In addition to the Zanesville staff,
the meeting was attended by Mr. Hampton, Linda Warrington (who
also worked in Local Operations in Columbus), and Jerry Lehman.
Ms. Warrington described the meeting as a "labor-management
meeting," although no one else characterized it that way.  She

also took notes at the meeting.  After she typed her notes from the handwritten version, she destroyed her handwritten notes, but because she had given copies of her notes to Mr. Hampton and Ron DeLisio, those notes survived and were produced at some time in this litigation.

Ms. Pysher did not see this meeting either as a team building meeting or as the "air-clearing" meeting she wanted to have with the staff.  In particular, she thought it was inappropriate that Mr. Hoffer attend because she considered him a harasser.  Nevertheless, the meeting went forward as planned.

According to Ms. Pysher, staff were essentially invited to criticize her at the meeting, in her presence.  Almost every staff member did so, although some of them also criticized Mr. McNair for his lack of management.  Staff were then excused and Ms. Pysher had the chance to discuss issues with Mr. Lehman and Mr. Hampton, as well as Mr. McNair and Mr. Hoffer.  Mr. Lehman expressed the opinion that Ms. Pysher was the problem, and had been a problem in other offices.  Mr. Hoffer repeated comments made by staff that it was unclear "which Bobbi" would arrive at work and that she was prone to mood swings, temper tantrums, outbursts, and other inappropriate behavior.  At the conclusion of the meeting, nothing was resolved.  A week later, however, Mr. McNair changed the reporting structure of the Zanesville office so that all staff employees would report directly to him.

Things did not improve in the next month.  In early December, Ms. Pysher was told that she was being transferred temporarily to the Delaware, Ohio office for "peace of mind."  At about the same time, the agency initiated a formal investigation of one of Ms. Pysher's complaints.  The stated purpose of the investigation was to determine if there was a hostile work environment in Zanesville.  Although Ms. Pysher had also made other discrimination or sexual harassment claims, those were

being handled by the Ohio Civil Rights Commission. It was ODJFS policy not to do a concurrent investigation with the OCRC. Investigator Reggie Smith was assigned to the investigation. He spoke to the Zanesville office employees using a questionnaire that had been developed from a standard questionnaire, with additional questions tailored to the Zanesville situation. The employee questionnaires, and a summary of the responses, are Exhibits P78Q and P78R. They provide an informative description of the staff members' view of Ms. Pysher's behavior and supervisory style, as well as some of the management issues in the office.

As noted on the Questionnaire Summary (P78R), the only discriminatory actions identified by any member of the staff were based on "personality." Most described the overall office atmosphere as "tense" or "stressful" and that it had became that way shortly after Ms. Pysher arrived. Ms. Pysher was described as intimidating and overbearing. Several employees reported that she had behaved inappropriately in front of customers. Mr. McNair was criticized for not exercising any control over Ms. Pysher. Staff indicated that Ms. Pysher and Mr. Hoffer essentially had no working relationship, and that Ms. Pysher seemed to control Mr. McNair and yelled or screamed at him. Several believed either that Ms. Pysher was capable of workplace violence or that her conduct (screaming, throwing things, slamming doors) constituted workplace violence. Almost all of them believed that the solution to the problem was to remove Ms. Pysher from the office.

That was also apparently the conclusion reached by Ms. Pysher's supervisors in Columbus. In an e-mail dated January 19, 2001, (Ex. P78J) Mr. DeLisio and Mr. Rietveld decided that Ms. Pysher would be permanently transferred to the Delaware office. This decision was not immediately communicated to Ms. Pysher,

however.  Rather, at some point she was instructed to file a formal request to transfer to Delaware.  She expressed uncertainty about the wisdom of doing so since the Delaware office would be closing and she had seniority in Zanesville.  She essentially asked that the status quo be maintained for a period of time.  However, Mr. Rietveld told her in an email dated February 15, 2001 "You have to make a choice" (Ex. P78O).

Ms. Pysher continued to work in Delaware as a temporary transfer until September, 2001.  On September 18, 2001, the manager of the Delaware office, George Faithful, issued a letter to Ms. Pysher describing her job duties effective September 24, 2001, which appears to be the effective date of her permanent transfer.  Her duties at that time were "all duties listed in the Position Description for a Customer Service Supervisor, classification number 64285."  (Ex. P62H).

By this time, as a result of a prior merger between OBES and the Ohio Department of Human Services which created ODJFS, a number of the agency's offices were being closed.  The Delaware office was one of those scheduled for closure.  When that happened, Ms. Pysher was transferred to an office in Franklin County.  She retained her position as a customer service supervisor.

Ms. Pysher testified that even after she came back to Columbus, she continued to experience problems with supervision. She identified a number of exhibits showing conflicts between her and her new supervisor, Karen Jordan, and also testified that she received various disciplinary counseling or suspensions during that time.  She believed that Mr. Hampton was somehow behind some or all of these incidents.  However, she presented no evidence of that involvement beyond her own speculation.

### B. Ms. Pysher's quest for jobs within ODJFS

In addition to claiming that she experienced retaliation after returning to work with ODJFS, Ms. Pysher claims that she was turned down for numerous jobs for which she applied during that same time frame. Before delving into the specifics of this claim, it is important to explain the position application system at ODJFS in some detail.

Most open positions are advertised through a job posting. The Ohio Department of Administrative Services (DAS) establishes the minimum qualifications for each position and those qualifications are listed on the job posting. An "Applicant Screening Worksheet" is then created by a personnel officer at ODJFS which lists those minimum qualifications. One or more personnel officers then complete the worksheet for each applicant by comparing the application to the qualifications listed on the worksheet. Those personnel officers conclude whether any particular candidate meets the minimum qualifications. If so, the candidate's name is placed on a list of qualified applicants and his or her application is forwarded to the hiring manager for the job. If not, the candidate is not considered further for the position.

There was some conflict in the testimony of the personnel officers concerning the details of this process. The job application form does not have sufficient space to allow an applicant to describe in great detail the dates of his or her prior jobs. In many cases, because the minimum qualifications consist of specific educational requirements or specific job experience, an applicant who does not have the educational prerequisites can meet the qualifications only be demonstrating that his or her prior work experiences satisfied the criteria, which one usually expressed in terms of a number of months or

years pertaining to specific types of job duties, such as supervision or management. Thus, applicants (including Ms. Pysher) would sometimes attach a resume or addendum to the official application form which contained more detail about their experience.

Several personnel officers who concluded that Ms. Pysher was not qualified for certain positions testified that they made that determination on the basis of the application alone. Others testified that they were trained to consider both the applications and any addenda, and that they did review Ms. Pysher's additional information. At least one of them testified that, upon further review, Ms. Pysher might have been minimally qualified for a job which she had been found not qualified for. All of the personnel officers who testified, however, stated that when they reviewed Ms. Pysher's job applications against the minimum qualifications – whether or not they found her qualified – they were unaware that she had ever engaged in any protected activity, including having filed a federal court action based on disability discrimination or having voiced certain complaints about discrimination while employed in the Zanesville office. They also testified that no one had ever told them to treat Ms. Pysher's applications differently than those of other applicants.

The testimony and documentary evidence clearly established, and the Court finds, that no one person or small group of people had control over, or even participation in, the various hiring decisions about which Ms. Pysher complained. Ms. Pysher applied for a variety of positions within ODJFS which were in a variety of departments or divisions. A few were under the jurisdiction of Local Operations, the group in which Ms. Pysher was employed and over which Mr. Hampton had some supervisory authority. Many were not, however, being located in such departments as personnel or management information systems. For these positions, there

was no evidence that anyone from Local Operations, or anyone who had any knowledge of Ms. Pysher's prior litigation activity or her discrimination complaints. Almost without exception, the personnel officers who screened the applications for these positions, and the hiring managers who made the final hiring decision, testified credibly that they did not know who Ms. Pysher was when they reviewed her application.

This is not to say that all of the job application processes at issue in this case were entirely free of error or possible arbitrariness. In at least one case, Ms. Pysher was determined to be qualified for a position, but her name did not appear on the qualified applicant list. The personnel officer who screened applicants, Carla Smith, was not sure if this occurred because Ms. Pysher's application was received somewhat later than others. It was dated only one day after the application of the successful candidate. However, there is no credible evidence that this omission was related in any way to Ms. Pysher's having engaged in protected activity. With this background in mind, the Court will now review the evidence concerning these applications.

Ms. Pysher applied for a very large number of jobs within ODJFS while she worked at both the Zanesville and Delaware offices. Because of the large number of job applications at issue, the Court will attempt to group them based upon similarities in either the type of job applied for or the reasons given for selecting someone other than Ms. Pysher so that the discussion of this issue is somewhat manageable.

As noted above, Ms. Pysher's background with ODJFS is in customer service supervision. She did have some human resources training in the past and also some computer systems training, but those are not areas in which she had significant experience. Her background was also on the job side rather than the unemployment claims side of the agency, and she had no relevant experience in

areas such as adoption or health care claims.

When applying for jobs within ODJFS, Ms. Pysher did not limit herself to jobs similar to the one she held in Zanesville or Delaware. Rather, it appears that she submitted an application for almost every opening within ODJFS for which she could conceivably have been qualified, including administrative assistant jobs, human resources jobs, and various jobs dealing with computers, including network and systems administrator positions. Again, as noted above, her job applications were screened by a variety of people within the human resources division, and the job selections were made by supervisors from a number of different divisions as well.

Kristopher Croom was one of the screeners who reviewed several of Ms. Pysher's applications for the positions of EEO manager and program administrator. He found her not to be qualified for three such positions based on her lack of course work or EEO experience or the absence of any evidence that she had performed program administrator duties. Although he admitted on cross-examination that, looking over her entire application, she might have been qualified for one or both of these jobs, there is no evidence that he made his original evaluations based on anything other than his good faith belief that she did not meet minimum qualifications. See Exhibits D149, D153, and D192.

Ron Kolbash was one of the EEO supervisors who chose applicants other than Ms. Pysher for several EEO manager or program supervisor positions. Ms. Pysher had been found by Mr. Croom not to be qualified for one of them. For the other, see Exhibit D150, Mr. Kolbash chose an applicant who had a strong background with other government agencies in the EEO area. It does appear that the applicant was permitted to supplement her qualifications a few days before the hiring date. It is not clear if that process violated some ODJFS policy. On the other

hand, it is also not clear that Ms. Pysher's qualifications for that position were so superior to (or even equal to) those of the successful candidate, Ms. Bagner, that retaliation should be inferred from Ms. Pysher's non-selection for this job.

Ms. Pysher applied for a number of administrative assistant positions, including administrative assistant 2 and administrative assistant 3. The AA2 job would have been a demotion for her. The first of these jobs was given to Beverly Flowers, who was described by Ms. Pysher as a temporary secretary. However, Ms. Flowers had been performing the job in question for almost a year before being hired into it. Melissa DeLisio, the hiring supervisor, spelled out the reasons for selecting Ms. Flowers, and there is no evidence suggesting that they were not the real reasons that Ms. Flowers was preferred over Ms. Pysher. <u>See</u> Exhibit D142.

Two other positions, both of which would have been demotions for Ms. Pysher, were filled by Melinda Armstrong and Mollie McCaments. Ms. Pysher was interviewed for these positions. Her test scores were lower than the two applicants selected. There were some irregularities noted in the hiring process, such as Ms. Armstrong's having been placed in the position on a temporary basis before being hired into it permanently, but the person who interviewed Ms. Pysher gave her an unfavorable recommendation, and there is no evidence that this evaluation was the product of any type of retaliatory motive. <u>See</u> Exhibit D145.

Ms. Pysher did not receive two other such positions, which were filled by Angie Simms and Tony Coder, the latter of whom was also put into the job before being permanently hired in. <u>See</u> Exhibits D147, D148. For some reason, not fully explained by the evidence, her name did not appear on the hiring list for one of these two jobs even though she should have been found qualified. However, there is no evidence about who left her off that list,

or why.  The absence of her name from the list would have prevented the hiring supervisor from considering her for the position.  She did not get another AA3 job filled by Theresa Lehr, who came from outside ODJFS, but the file shows that Ms. Lehr had extensive experience, that there were a number of other internal applicants for this job besides Ms. Pysher, and that none of them were selected.  Again, there is no evidence that the hiring supervisors for this job knew Ms. Pysher or knew about any protected activity she may have engaged in.  See Exhibit D181. She was also not selected for an AA3 position in the office of Management and Information Systems.  See Exhibit D172.  However, the hiring manager for this job, James Shirley, testified that he was looking for someone with experience in procurement for MIS and in fiscal work, a background Ms. Pysher did not have.  The successful candidate, Robert Wallace, had a degree in business administration and some graduate course work.

Ms. Pysher also applied for at least two management analyst supervisor jobs.  Both were filled with external applicants.  See Exhibit D144.  According to the testimony of Janet Kaplan, who was involved in the hiring decisions and who was a very credible witness, the successful applicants possessed a background in the human resources area and in test development that, at least in Ms. Kaplan's view, Ms. Pysher did not have.  Ms. Pysher was found by Carla Smith, also an HR screener, not to be qualified for another such job.  Exhibit D174.  Carla Smith testified that she did not know Ms. Pysher.

Ms. Pysher applied for a number of jobs in the information technology area.  Wendy Givler was the hiring manager for many of these positions.  She testified that, for the most part, these jobs were  given to bargaining unit employees because they had first preference under the applicable collective bargaining agreement.  Ms. Pysher, as a supervisor, was not a bargaining

unit employee.  Additionally, Kimberly Smith, an HR screener, determined that Ms. Pysher was not qualified for at least two of these positions.  Neither Ms. Givler nor Ms. Smith knew Ms. Pysher.

Ms. Pysher submitted several applications for administrative assistant 4 positions.  She points out that one of them was given to John Cunningham, who applied two months after the application deadline and who appears to have filled out his application the day after he was hired.  However, the file on this particular position, Exhibit D171, shows that Mr. Cunningham was interviewed before the hiring decision was made, and it also shows that Ms. Pysher's name did not appear on the list of candidates who were screened for the job.  Her name also did not appear on the list of applicants for a second AA4 job, which was awarded to Jennifer Dillon, an external applicant, although it appears she was found qualified for that job.  Exhibit D173.  A third such position was awarded to Henry Sellan, also an external applicant, who, as Ms. Pysher noted, had no prior governmental experience.  The exhibit on this hire (Exhibit P35) does not show whether Ms. Pysher was found qualified, but it does indicate that a number of people (and apparently not Ms. Pysher) were interviewed before Mr. Sellan was selected.

Finally, Ms. Pysher applied for other customer service supervisor positions in an effort to get out of the Zanesville office.  One of those jobs was given to David Richardson, who was employed as an account executive in the Dayton One Stop Employment and Training Center.  The file indicates that the move was a demotion for him.  The position he filled was also in the Dayton office.  He had worked for ODJFS or OBES since 1974 in Dayton.  It is not clear that Ms. Pysher was more qualified than he was for this position, nor is there any evidence about who made that hiring decision.

This is not an exhaustive list of the jobs which Ms. Pysher applied for after her reinstatement, but it does cover most of the ones about which testimony was given and which occurred in the 1999-2000 time frame. Ms. Pysher also applied for a promotion to a new supervisory position which was created when the number of ODJFS offices around the state was dramatically decreased. She was in competition for these positions with many of the existing office managers, the majority of whom would no longer be office managers after the consolidation occurred. There is a lack of credible evidence that she was either more qualified than any of the persons selected as office managers through this process, or that her prior protected activity was taken into account by anyone involved in the selection process in deciding whether to offer one of these positions to her.

## II. Discussion

The legal framework for the evidence presented at trial is set forth in the Court's Opinion and Order of January 7, 2008. The conclusions of that order are summarized briefly here.

In the Opinion and Order, the Court ruled on the parties' competing motions for summary judgment. After granting the defendants' motion in part, the Court identified the issues for trial as "Ms. Pysher's Title VII retaliation claims against defendant Ohio Department of Jobs and Family Services (which retaliation claims include her claim for retaliatory work conditions and her claim for retaliatory failure to promote)." The Court held that summary judgment was not appropriate on these claims because there were factual issued that needed to be resolved. Those issues included the actual conditions under which Ms. Pysher was required to work, whether those conditions would have deterred a reasonable person from complaining about discrimination, whether the defendants either created those conditions or allowed them to continue because Ms. Pysher had

previously complained about (and litigated issues relating to) unlawful discrimination, and whether Ms. Pysher was denied any transfers or promotions for retaliatory reasons.

As the Court observed, citing to the Supreme Court's decision in <u>Burlington Northern & Santa Fe Ry. Co. v. White</u>, 126 S.Ct. 2405 (2006), "in order to state a claim for retaliation, the employee must, at a minimum, allege or prove an action taken by the employer which "well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" <u>Id</u>. [at 2415], <u>quoting</u> <u>Rochon v. Gonzales</u>, 438 F.3d 1211, 1219 (D.C. Cir. 2006)." Opinion and Order, at 7. As the Court also observed, however, proof of such adverse actions or job conditions is not enough. The plaintiff must also show "a causal connection between her protected activity and the adverse employment action. <u>See</u> <u>Morris v. Oldham County Fiscal Court</u>, 201 F.3d 784, 792 (6th Cir. 2000)." Opinion and Order, at 9.

In denying summary judgment to the defendants, the Court held that the work conditions described by Ms. Pysher were sufficiently unpleasant to satisfy the "relatively low bar" described in the <u>Burlington Northern</u> decision. Ms. Pysher testified at trial to essentially the same conditions that she described in her deposition and in opposition to the summary judgment motion. The Court has no difficulty in concluding that her situation in Zanesville, including the treatment she received from Mr. Hoffer and, mostly through inaction, from Mr. McNair, was extremely unpleasant. Further, a reasonable employee would have found it to be so. Thus, the real question to be answered in this case about the Zanesville work situation – and it is a factual question, not a legal one – is whether any named defendant in this case created or perpetuated that work environment, even in part, because Ms. Pysher engaged in some type of protected activity. For the following reasons, the Court

15

is not persuaded that this occurred.  Because Ms. Pysher, as the
plaintiff, has the burden of proof on the issue of causation, the
failure to meet that burden is fatal to her claims.

There is no question that Ms. Pysher was placed in
Zanesville within a short time after she won reinstatement to
ODJFS.  It is worth noting, as defendants point out, that her
reinstatement was not actually a result of her federal court
litigation, but rather the outcome of a state court proceeding
which dealt not with whether she had been the victim of
discrimination, but whether the sanction of dismissal had been
too harsh for the insubordination Ms. Pysher had committed.  The
state court decision reduced her dismissal to a ninety-day unpaid
suspension.  Nevertheless, her reinstatement roughly coincided
with a favorable outcome of her federal litigation.  The Court
must therefore consider whether, because the placement in
Zanesville was close in time to the successful resolution of Ms.
Pysher's federal litigation, there was some connection between
the two.

Based upon a review of all the evidence, the Court finds
that there was not.  The defendants claimed that Ms. Pysher was
assigned to the Zanesville office only because there were no
openings in any of the Columbus locations for an Employment
Services Supervisor.  There is some question about whether this
was true.  Nevertheless, even if it were not, the most likely
reason for Ms. Pysher's placement in Zanesville is that she had a
history of difficulties in Columbus, leading to her 1996
termination, and Zanesville would give her a chance for a fresh
start.  There is no evidence either that the defendants knew that
simply making her drive to Zanesville every day (she lives in
Pickerington, so the drive is not onerous) or working in that
office would be a substantial burden to her.

In hindsight, of course, Zanesville turned out to be less

than an ideal environment for Ms. Pysher. That occurred, however, not because any of the defendants either intended it or directed it to happen, but because, for whatever reason, Ms. Pysher was not accepted by the staff and the other supervisor in Zanesville. It is not helpful, in the context of this case, to identify the exact reasons for the conflict which developed in that office between Ms. Pysher, Mr. Hoffer, and the staff they were both supposed to supervise. It is enough for the Court to find that the conflict was not related, either in whole or in part, to any previous litigation or other protected activity in which Ms. Pysher had engaged. Simply put, the defendants, who knew about Ms. Pysher's prior litigation history and who decided to place her in Zanesville, had no way of knowing that the problems in that office would develop as they did, and they played no role in causing the rift between Ms. Pysher and Mr. Hoffer. Unfortunate as it was, the tension in that office developed without anyone's else's assistance or encouragement. It is probable that the situation deteriorated to unacceptable levels because Mr. McNair either did not, or could not, find ways to defuse the situation, but again, he was acting (or failing to act) based upon his perception of the situation facing him, and was not motivated in any way by his knowledge of Ms. Pysher's prior protected activity or a desire to punish her for it.

It is clear, however, that there were ODJFS supervisors in Columbus who learned, primarily through Ms. Pysher's many emails and complaints, that the Zanesville situation was bad and getting worse. At some point, they became aware that she was not getting along with Mr. Hoffer, and that Mr. McNair was not helping the situation. They also became aware that some of Ms. Pysher's supervisory duties were being performed by Mr. Hoffer and that Mr. McNair was not doing a good job of making sure that Ms. Pysher had meaningful job responsibilities and a responsive

17

staff.  The were certainly aware that she wanted them to make
major changes, including investigating the situation that existed
in Zanesville and transferring her out of that office.  Finally,
they were also aware that she had litigated issues against ODJFS
and had engaged in protected activity.  These supervisors
included, at a minimum, Mr. DeLisio and Mr. Hampton.  The
pertinent question for this case is whether they treated Ms.
Pysher differently (and less favorably) than they would have
treated some other supervisor who found herself in this type of
uncomfortable position and did so because of her prior protected
activity.  Again, on this primarily factual issue, the Court
finds that Ms. Pysher did not prove by a preponderance of the
evidence that these supervisors' seeming inaction in the face of
her many complaints was related in any way to her prior protected
activity.

        The responses which Ms. Pysher received when she complained
to ODJFS officials in Columbus, such as Mr. Hampton, were often
not helpful.  Mr. Hampton told Ms. Pysher that he would do what
he could to assist her.  However, that apparently did not include
intervening on her behalf when she applied for positions outside
the Zanesville office.  Further, when the "intervention" event
(which somehow became a substitute for the "team building" event
Ms. Pysher had requested) took place in October of 2000, little
was accomplished other than to give the Zanesville office
employees the chance to vent their frustrations in Ms. Pysher's
presence.  No real effort was made to assist Mr. McNair in
managing the tensions in his office, or even to help him identify
the causes of those tensions (to the extent that he was not
already aware of them).  Nevertheless, the Court finds that Ms.
Pysher did not prove that any inaction on the part of the
Columbus ODJFS officials stemmed from her prior protected
activity, or even from her complaints about harassment and

discrimination that she made after she resumed employment in
1999.  The most likely explanation for that inaction is the fact
that ODJFS is a large bureaucracy, and it is the nature of
bureaucracies to act slowly and inefficiently and to discourage
individual actions (such as having someone like Mr. Hampton
actively intervene in the position application process) which go
against normal organizational behavior.  In any event, there is
no evidence to suggest that Ms. Pysher was being treated any
differently than any other dissatisfied employee.  In fact, the
decision to transfer her to Delaware, belated as it may have been
(at least from her point of view), appears to have been an
accommodation that ODJFS would not have offered to everyone in
her position.

       Much the same can be said about the job application process.
Ms. Pysher offered proof that not every application she submitted
was treated in the same way, and that errors in both process and
judgment may have occurred along the way.  Given the number of
applications she submitted, the variety of positions she applied
for, and the way in which the screening and selection process
worked, variations in procedures were inevitable.  Again, Ms.
Pysher did not prove to the Court's satisfaction (that is, by a
preponderance of the evidence) that any individual screener or
hiring manager excluded her from being considered qualified, or
refused to hire her, based on any protected activity she might
have engaged in.  Most of the decision-makers knew nothing about
such activity, and many did not even know her name.  It is
perhaps possible that this diverse group of people were acting in
concert to deny Ms. Pysher any other position at ODJFS and that
they were directed or encouraged to do so by the handful of
supervisory officials who knew of Ms. Pysher's protected activity
and wanted to frustrate her ability to move up, down, or
laterally in the organization, but that type of large-scale,

covert conspiracy is not a likely scenario and there is no credible evidence to support such a claim. In short, the Court does not draw the inference that Ms. Pysher failed either to get any particular position, or to get any of the myriad of positions she applied for, because she had engaged in protected activity. Because that inference is not drawn, Ms. Pysher has not established the necessary factual predicate for her retaliation claim, and that claim therefore fails.

### III. Conclusions of Law

1. An employer, including a state agency such as the Ohio Department of Jobs and Family Service, may not discriminate against an employee who "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [certain provisions of Title VII of the Civil Rights Act of 1964]." 42 U.S.C. §2000e-3(a). Such actions by employees are generally described as "protected activity."

2. The type of employer actions prohibited by the anti-retaliatory language of §2000-3(a) are actions which would dissuade a reasonable employee from either making a charge of discrimination or supporting such a charge made by another individual. Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).

3. In order to satisfy his or her burden of proof in a case based on retaliatory conduct in violation of §2000e-3(a), an employee must present either direct evidence of retaliation or circumstantial evidence consisting of proof of the following four elements: "that: 1) [the employee] engaged in activity that Title VII protects; 2) defendant knew that [s]he engaged in this protected activity; 3) the defendant subsequently took an employment action adverse to the plaintiff; and 4) a causal connection between the protected activity and the adverse employment action exists." Abbott v. Crown Motor Co., Inc.,

348 F.3d 537, 542 (6th Cir. 2003); see also Balmer v. HCA, Inc., 423 F.3d 606 (6th Cir. 2005).

4.  "[T]he mere fact that an adverse employment decision occurs after a charge of discrimination is not, standing alone, sufficient to support a finding that the adverse employment decision was in retaliation to the discrimination claim." Booker v. Brown & Williamson Tobacco Co., Inc., 879 F.2d 1304, 1314 (6th Cir. 1989).

6.  Even if the employee presents some evidence from which it can be inferred that there is a causal relationship between the employee's protected activity and the actions taken by the employer, if the employer articulates a legitimate, non-discriminatory reason for its actions, the employee has the burden to prove by a preponderance of the evidence that the proffered reason was not the true reason the employer took action, so that the Court can infer that the articulated reason is merely a pretext for retaliation. See Morris v. Oldham County Fiscal Court, 201 F.3d 784 (6th Cir. 2000).

7.  Ms. Pysher engaged in protected activity prior to and during her time at the Zanesville office of ODJFS. Officials within ODJFS were aware of that activity. Some of their actions, taken after they were aware of that activity, may be the type of actions which would dissuade a reasonable employee from engaging in protected activity.

8.  Ms. Pysher did not prove, by a preponderance of the evidence, that any action or inaction of the defendants about which she complains in this case was taken, either in whole or in part, because she had engaged in protected activity. In other words, she simply failed to persuade the Court that it is more likely true than not true that the defendants acted or failed to act in a way that adversely affected her because she had engaged in protected activity.

9.  Further, even if the evidence were sufficient to allow the inference to be drawn that the defendants were motivated in whole or in part by Ms. Pysher's prior protected activity, Ms. Pysher did not prove, by a preponderance of the evidence, that any explanations given by the defendants for their actions – such as their failure to select Ms. Pysher for any of the positions she applied for, their failure to extract her more quickly from the Zanesville office, or their decision to transfer her to Delaware – were not the true reason for those actions.

10.  Because Ms. Pysher has failed to prove her claims of retaliation, the defendants are entitled to judgment.

IV.  <u>Decision</u>

For the reasons set forth above, this action is dismissed with prejudice.  The Clerk is directed to enter judgment in favor of the defendants and to terminate this case.

<u>/s/ Terence P. Kemp</u>
United States Magistrate Judge
